NOTICE
Decision filed 09/27/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210122-U

NOS. 5-21-0122, 5-21-0145 cons.

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court of |
| ANGELICA MARTINEZ McCALLISTER, | ) | Madison County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 17-D-942 |
| | ) | |
| AMANDA ROWEN McCALLISTER, | ) | |
| | ) | |
| Respondent-Appellant | ) | Honorable |
| | ) | Maureen D. Schuette, |
| (Charla Finn and Steven Finn, Intervenors-Appellants). | ) | Judge, presiding. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Wharton concurred in the judgment.

**ORDER**

¶ 1    *Held*: In this consolidated appeal, we affirm the orders of the circuit court of Madison County, because (1) the order modifying medical decision-making responsibilities was not against the manifest weight of the evidence, and the appellant is not entitled to relief on her other contention with regard to that order, and (2) the trial judge did not err in entering the order denying the petition for leave to intervene of the proposed intervenors.

¶ 2    In this consolidated appeal, the respondent, Amanda Rowen McCallister (Amanda), appeals the order of the circuit court of Madison County that, *inter alia*, modified medical decision-making responsibility with regard to the minor children in this case. The proposed intervenors, Charla Finn and Steven Finn (the Finns), are Amanda's parents. They appeal the order

1

of the circuit court of Madison County that denied their petition for leave to intervene in this matter. For the following reasons, we affirm the orders of the circuit court in all respects.

¶ 3                                    I. BACKGROUND

¶ 4      Although the record in this case is voluminous, the facts necessary to our disposition of the narrow issues raised in this appeal are fairly straightforward, and are as follows. Amanda and the petitioner, Angelica Martinez McCallister (Angelica), were married on September 19, 2014, in Madison County. They were divorced on September 7, 2018. On September 19, 2018, the parties filed with the court an amended agreed parenting plan (the plan) that provided, of significance to this appeal, that Amanda would have sole medical decision-making responsibility for the two minor children of the parties, and that "[g]randparents" would have parenting time with the children each week from Tuesday at 3 p.m. until Wednesday at 8 a.m., with the caveat "[t]hat the parties agree and acknowledge that the award of time to [g]randparents herein is non-prejudicial, and is subject to elimination in the future should parenting time be modified and the parties cannot agree on this time." Other than the trial court judge, only Amanda and Angelica signed the plan. No grandparents were signatories to it.

¶ 5      On October 4, 2019, Amanda filed an amended motion to modify the plan, wherein she alleged a substantial change in circumstances had occurred, and wherein she asked the trial judge to modify the plan so that she had sole decision-making responsibility on all matters, and to modify parenting time to suit the best interests of the minor children. She did not ask specifically for any change to the parenting time allotted to grandparents, referenced above.

¶ 6      On November 27, 2019, Angelica filed a motion to modify the plan. She too alleged a substantial changes in circumstances. She alleged, *inter alia*, that the Finns were not "routinely" utilizing the parenting time allotted by the plan to them as grandparents, and that Amanda was using that "time to supplement her own parenting time." She asked the trial judge to, *inter alia*,

"remove" the parenting time allotted to grandparents in the plan. Other filings, not relevant to the issues raised in this appeal, followed. Thereafter, on October 14, 2020, Angelica filed another motion to modify the plan, wherein she again alleged a substantial change in circumstances, and wherein she asked that medical decision-making responsibility be modified from Amanda having sole responsibility, to the parties having joint responsibility.

¶ 7     On November 12, 2020, the Finns filed a petition for leave to intervene. Therein, they stated that they sought "to defend" the parenting time provided to them by the plan. They based their arguments upon their interest in the rights that were conferred upon them by the plan. They did not argue that they had a separate statutory right to visitation. However, they did argue, in a separate filing that accompanied their petition for leave to intervene, that the trial judge should base any decision to modify their visitation time on "the factors of 750 ILCS 5/602.9." Angelica moved to dismiss the petition, contending that pursuant to the plain language of the plan, the Finns did not have standing to contest any modification to the plan. The Finns filed a response, contending that because of the rights conferred upon them by the plan, they were not required to meet any kind of initial standing requirement, and were "necessary" parties to the action.

¶ 8     A telephonic hearing on the petition for leave to intervene was held on February 11, 2021. Following the hearing, but still on February 11, 2021, the trial judge entered a typewritten order wherein she denied the petition for leave to intervene. The trial judge stated in her order that Amanda and Angelica were both represented by counsel at the time they executed the plan, and that their intent, with regard to parenting time for grandparents, was clear from the plain language of the plan. She did not specifically address the issue of the Finns' standing.

¶ 9     On March 4, 2021, the Finns filed a motion to clarify, wherein they contended that during the hearing, the trial judge stated that the Finns' petition for leave to intervene was premature, because no change to their parenting time had occurred yet. The Finns asked the trial judge to

3

include this reasoning in her written order. The motion to clarify was denied, without comment or analysis, on March 10, 2021.

¶ 10 A trial on all other pending matters was held on April 8 and 9, 2021. Amanda appeared *pro se*, and Angelica appeared with counsel. The following testimony relevant to the issues raised in this appeal was adduced. Dr. Sarah Dyer testified that she is a clinical psychologist who specializes in neuropsychological evaluations. She testified with regard to her evaluation of one of the minor children in this case, and that child's diagnoses of autism and ADHD. She testified that she did not know Angelica, and that Angelica did not attend any of Dr. Dyer's evaluation sessions with the minor child, although Angelica subsequently requested and received a copy of Dr. Dyer's report. On cross-examination by Angelica's counsel, Dr. Dyer was asked if, with regard to a child on the autism spectrum, there was "any reason to believe that the parents can't share an equal parenting time schedule?" She replied, "I don't think there's any reason why."

¶ 11 Charla Finn testified that she is Amanda's mother and the grandmother of the two minor children in this case. She testified that she has a flexible work schedule and has exercised her parenting time with the children, as per the plan, on a regular basis. She testified as to some of the activities she engages in with the children, and testified that she did not wish for her parenting time to be removed from the plan. She testified that she believed the minor children wished for the time to continue as well. On cross-examination, Charla testified that she believed Angelica was a good mother, who "has a lot of love to give." She testified that if her current parenting time with the children were to be eliminated from the plan, she believed she would still get time with the children, including overnights, because "Amanda would make sure it happens." When examined by the guardian *ad litem* (GAL), Charla testified to times, other than the times specified in the plan, that she saw and visited with the minor children.

4

¶ 12    Dr. Robert C. Clipper testified that he is a licensed marriage and family therapist who, at the time of the trial, had been doing custody evaluations for approximately 30 years. He testified that he believed his recommendation that medical decision-making responsibility should be changed from Amanda's sole responsibility to a joint responsibility of Amanda and Angelica was justified because he believed it was in the children's best interest for Amanda and Angelica to work together to make medical decisions, rather than having only one parent make the decisions. He testified that if Amanda and Angelica could "adequately thoughtfully attend the children's medical needs," that would be in the best interest of the children. He testified that Amanda and Angelica often disagreed about medical decisions, but testified that it was his wish that they "have some maturity about how [they] make decisions instead of having to" return to court each time there is a dispute. He testified that he believed Amanda's position amounted to a desire to keep Angelica "out of the lives of the children," which was a position for which he found no support. He testified that therefore he believed Angelica's position, which was that they should share decision-making, was more reasonable. He agreed that in his report, he found both Amanda and Angelica to be fit parents, although he believed they "struggled" with coparenting. He acknowledged that his report was prepared approximately one year prior to the trial, and that circumstances could have changed since then. He also testified that he believed mandating "grandparenting time" was "a complicating factor" in the relationship between Amanda and Angelica because it led to conflict between them.

¶ 13    On cross-examination, Dr. Clipper testified that he administered psychological examinations to both Amanda and Angelica, and that Amanda came "across such that she needs a lot of endorsement, needs a lot of admiration, has difficulty accepting the flaws of other people and needs to be admired," and that Angelica had issues with anxiety and depression, as well as "a lot of self-doubt and insecurity." He testified that given the difficulty they had getting along with

5

each other, he believed that it was in the children's best interest to "balance the playing field" so that Amanda and Angelica had to work together, rather than allowing one of them to have sole decision-making power, which he believed would be used to "manipulate" the other party. He testified that he believed that when Amanda had sole medical decision-making power, she "utilized" that power in a way that created conflicts with Angelica. He testified that he believed the children "[a]bsolutely" should have a relationship with their grandparents, but that to remove conflict between Amanda and Angelica, the children should have time with the grandparents during the time allocated to each respective parent, rather than at a separate time as currently stated in the plan. He testified that with regard to medical decision-making, he believed each parent should be able to make her own decision on minor or "routine care" matters when that parent had the children, as long as she kept the other parent informed, but that on "larger, more extreme, kind of, care kind of things *** they should be involved jointly in making that decision."

¶ 14    Angelica and Amanda also testified, with each describing their interactions—including conflicts—with each other, as well as interactions with the children and extended family members such as the Finns, and financial matters. With regard to coparenting, Angelica testified that she believed her coparenting with Amanda had improved since they began to have less face-to-face contact. She testified as to times when she felt her power to help the children with medical issues was limited by the fact that Amanda had sole medical decision-making responsibility. She testified that although she and Amanda usually agreed on a course of medical treatment once it was recommended by a physician, they often disagreed on the threshold question of whether medical care was warranted in a given situation. She testified that she wanted medical decision-making responsibility to be joint because, as things currently stood, Amanda had indicated that she was not comfortable with Angelica making appointments for "even routine care" and had, in essence, completely shut Angelica out of medical decisions, including by attempting to limit her access to

6

the children's medical records. Angelica testified that she believed there were "quite a few times" that the Finns did not exercise the parenting time allotted to them by the plan. She testified that she believed the children's time with the Finns was "absolutely very important," but that the children spent plenty of time with the Finns during Amanda's parenting time, and would continue to do so, and that the Finns did not need their own separate time. She further testified that she believed that removing the Finns' separate parenting time would reduce conflict between her and Amanda.

¶ 15    Amanda testified that although she did exercise her sole medical decision-making power "when necessary," she nevertheless did "try to consider [Angelica's] thoughts and opinions." She testified that she believed the children's medical needs were currently "very well-met," and that they were happy and healthy. She testified that she believed Angelica "harassed" her about the children's medical needs, and that Angelica "claimed their needs have been neglected at times" and "pushed repeatedly for unnecessary doctors' appointments." She testified that the Finns "routinely exercise" their visitation rights under the plan, and that the children benefit from the consistency that the arrangement provides for them. She testified that she and Angelica "were highly combative in 2019." She apologized and took responsibility for her role as part of that, and testified that she believed they "both made some mistakes, especially in how [they] worded things" when communicating. Amanda added, "I feel like as bad as things were in 2019, I have tried hard to change the way that I feel about the situation and try and just move forward for the boys. I know that the boys' needs require us to work together." She testified that she knew Angelica loved the children, but believed that Angelica was "so spiteful and angry with [Amanda] about everything" that the two of them could not "co-parent effectively." She added that she believed it was "important to be able to move past those disagreements, though, so that we can get back to working together for the boys." She testified that she believed she and Angelica had "a duty to one another

7

and to the boys to work together," but that Angelica was not meeting that duty. She added that she "would love nothing more than for us to co-parent like parents" she observed. She testified, however, that she worried that their communication problems would prevent that. She thereafter testified that she had been attending counseling, found it helpful for dealing with her issues with Angelica, and did not "want to parent alone." She added, "I don't think that that's great for kids anyway. I think that if kids can have two good parents in their life, they should."

¶ 16 Thereafter, the GAL testified. She testified that she had been involved in this case since late 2017, on behalf of the two minor children. She testified that she asked Dr. Clipper to become involved in the case because she "was concerned about [Amanda and Angelica's] inability to work together and their inability to communicate and just whether or not there was any hope for them to ever co-parent." She testified that she had reviewed Dr. Clipper's reports and was present for his testimony at trial. She testified that she agreed with his recommendations on decision-making. She explained that she believed there was "a power struggle between Amanda and Angelica that" she believed was "primarily coming from Amanda." She testified that she believed that "if there's any power that one party has over the other, it negatively impacts their ability to co-parent. And so if they have equal power, hopefully that will at least take down some of the problems that are created by that power imbalance." She testified that although she was "concerned they're going to continue with the high level of conflict," she believed "that ultimately they both have the same desire to have healthcare for their children and to have healthy children," which led her to believe "that if they both have the same responsibility—the same amount of responsibility for decision-making that they will ultimately make good decisions for their children." For that reason, she too recommended joint medical decision-making responsibility. With regard to the time allotted to the Finns under the plan, she testified, "I'm recommending to get rid of the mandatory Tuesday night [with the Finns] and have equal parenting time between the two parties that they can then allocate

to the grandparents if they want to." On cross-examination, the GAL testified that she did not believe that under joint medical decision-making, there would be delays to either emergency or routine care for the children. She testified that she did not believe the current time allotted to the Finns was "necessary," because she believed they already spent a lot of time with the children, and would continue to do so even if the plan were modified to remove their current time. At the conclusion of the trial, the judge took the matter under advisement.

¶ 17 Approximately two weeks later, on April 23, 2021, Amanda filed a motion for costs and fees, in which she requested that the trial judge require Angelica to reimburse Amanda for "the entirety" of Amanda's costs in this litigation. She referenced the filing of an affidavit of fees along with the motion. She alleged that her total costs for this litigation amounted to $7825. She sought reallocation or reimbursement for mediation fees, GAL fees, custody evaluation fees, and drug testing fees.

¶ 18 Six days thereafter, on April 29, 2021, the trial judge entered a 16-page typewritten order in which she ruled, of significance to the issues raised in this appeal, as follows. With regard to Angelica's request that the plan be modified to incorporate joint medical decision-making responsibility, she ruled that in light of the testimony and other evidence of record, and in light of the relevant statutory best-interest factors, which she discussed in detail, she agreed with Angelica. She stated, *inter alia*, that Dr. Clipper's testimony was that joint decision-making would reduce the amount of conflict between Amanda and Angelica, despite their longstanding pattern, in their relationship, of having difficulties with communication. She noted that she found both Amanda's and Angelica's testimony about some of the conflicts between them to be "somewhat hazy," but also noted the positive testimony that each gave about the other, in particular that each believed the other was a good parent who loved the minor children and was doing her best for them. The trial judge pointed out that evidence of conflict between Amanda and Angelica certainly existed,

9

and gave several examples of it, but noted that Dr. Dyer had testified that there was no reason Amanda and Angelica could not share joint parenting, and that Dr. Clipper and the GAL both agreed with that assessment. She ordered Amanda and Angelica, together with the minor children, to engage in counseling to improve their communication, "help them learn to reduce conflict, and to improve their co-parenting skill set."

¶ 19    With regard to Angelica's request that the plan be modified to remove the parenting time for grandparents, the trial judge ruled that it was in the best interests of the minor children for this to happen. She stated that she was "fully aware" of the language of the plan with regard to this question, and noted that the plan allowed for the removal of the parenting time for grandparents if Amanda and Angelica could not agree on its continuation, which, she ruled, they "clearly" could not. She also noted that both Dr. Clipper and the GAL recommended the removal of the parenting time for grandparents, because each believed Amanda and Angelica would continue to facilitate visitation with the respective grandparents during Amanda's and Angelica's respective regular parenting time. The trial judge added, "Each parent has plenty of time allocated to them to allow the children to spend time with their family members if they so choose." Later in her order, she reiterated that Amanda and Angelica could "choose to have grandparents or others have the children during their time."

¶ 20    Although the trial judge's order listed, in a separate section, "pleadings" that were "[p]ending before the [c]ourt," it did not specifically list, in that section, Amanda's April 23, 2021, motion for costs and fees. However, elsewhere in the order, in a section of the order entitled "[a]ttorney fees," the trial judge ruled, "Each party is ordered to pay their own attorney fees and costs." In a section of the order entitled "GAL fees," the trial judge ruled that Angelica was required "to pay the remainder of the GAL Fees still due and owing." The trial judge did not otherwise order either party to pay the other for any costs or fees.

¶ 21    Amanda did not file a motion to clarify, or a motion to reconsider, any aspects of the order, although she did file a motion asking the trial judge to stay her ruling, pending appeal. Her motion was denied. Amanda filed a notice of appeal on May 6, 2021. On May 7, 2021, this court notified Amanda that her appeal was assigned docket No. 5-21-0122. On May 25, 2021, the Finns filed a notice of appeal, which was assigned docket No. 5-21-0145. Upon the request of Amanda and the Finns—who are represented by the same attorney on appeal—we consolidated their appeals for purposes of the record, briefing, oral argument, and decision. We now render our consolidated decision in both cases.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, Amanda contends the trial judge erred because, according to Amanda, the trial judge's modification of parental responsibilities was against the manifest weight of the evidence, and because the trial judge's "denial of a reallocation hearing was in error." The Finns contend that the trial judge's denial of their petition for leave to intervene was in error.

¶ 24    With regard to her argument, Amanda posits that the trial judge erred when she modified medical decision-making responsibilities from being solely Amanda's responsibility, to being joint. She does not challenge any other modifications made by the trial judge. Citing multiple cases that involve joint custody in general, Amanda contends that in this case, the trial judge erred because "[t]he record is replete with examples of the parties' total failure to work together." She points to the fact that she once sought criminal charges against Angelica, termination of Angelica's parentage with regard to one of the children, and that their texts with each other often lack civility. She contends the medical issues involved in this case "are voluminous," and that medical decisions are the area in which her disagreements with Angelica are the most frequent and most intense. She points to this court's recent opinion in *In re Marriage of Virgin*, 2021 IL App (3d) 190650, and contends that in this case, as in *Virgin*, the parties' inability to cooperate has led to the deterioration

11

of a medical condition. She further argues that "[i]t could be inferred that this modification was experimental," to see if the parties could work together better if required to make decisions jointly, and that courts typically frown upon experimental modifications. With regard to her second point on appeal, Amanda contends that the trial judge erred when she failed to conduct a hearing on Amanda's request for reallocation or reimbursement for mediation fees, GAL fees, custody evaluation fees, and drug testing fees. She posits that the trial judge might have overlooked her motion, which was filed just days before the judge entered her order, but contends that existing case law requires a judge to hold a hearing upon such a motion, and that the trial judge did not have discretion to fail to do so. She asks this court to reverse the trial judge's order and remand for further proceedings.

¶ 25    With regard to their argument, the Finns contend that the trial judge erred when she ruled that the terms of the plan prohibited the Finns from intervening in this case. On appeal, the Finns posit that because they were not signatories to the plan, their right to grandparent visitation is statutory in nature, deriving from the Illinois Marriage and Dissolution of Marriage Act and its amendments (the Act), and that therefore the provisions of the Act that deal with modification of grandparent visitation must prevail in this case, notwithstanding the terms of an agreement—the plan—to which they are not parties. They contend that pursuant to the relevant provisions of the Act, they have "the right to modify or defend their visitation interests." They claim that the plan conflicts with the Act, and therefore must yield to the Act, to the extent that the plan restricts their "right to intervene and defend their interests." The Finns ask this court to reverse the trial judge's order that denied their petition to intervene, reverse the order that terminated their visitation time, and remand for further proceedings.

¶ 26    With regard to Amanda's arguments, Angelica responds in her brief on appeal that the trial judge's ruling as to medical decision-making responsibilities was not against the manifest weight

of the evidence. She contends that the cases cited by Amanda are not relevant to this appeal, because those cases discuss joint custody and equal parenting time, which is not something that Amanda has contested in this appeal. Angelica contends that Amanda's cases are not persuasive in terms of joint decision-making. She posits that Amanda is essentially asking this court to reweigh the evidence in this case, with no deference to the trial judge, which is not appropriate, as it is contrary to this court's standard of review. She adds that the trial judge in this case specifically considered the parties' past history of conflict, and that accordingly there can be no merit to any argument that she failed to adequately address that as a factor in reaching her decision. Angelica points to evidence in the record that supports the trial judge's decision, as well as cases in which courts of review have upheld trial court decisions because those decisions were not against the manifest weight of the evidence.

¶ 27    As to Amanda's argument about a "reallocation hearing," Angelica contends that Amanda has waived any issues with her request for fees, because Amanda never requested a hearing on her motion, and, after the trial judge entered her April 29, 2021, order, never filed a motion to reconsider that raised the purported error. She contends that although Amanda filed a motion to reconsider an earlier order, that motion is not applicable to the trial judge's April 29, 2021, order, as it was resolved by a different agreed order. She also points out that the April 29, 2021, order does address GAL fees, and that if this court were to find that the trial judge improperly failed to rule on the remainder of Amanda's request, that would call into question the jurisdiction of this court to consider the other issues raised herein, because there would be no final and appealable order in this case.

¶ 28    With regard to the Finns' argument, Angelica responds in her brief on appeal that the trial judge's decision to deny their petition for leave to intervene was not an abuse of discretion. She posits that the circuit court in this case "lacked jurisdiction to impose grandparent visitation absent

an agreement and parents did not waive this argument where the [plan] made clear grandparent visitation would be terminated absent an agreement." She argues that the visitation afforded to the Finns in the plan did not make them parties to this action, and that accordingly they still were required to demonstrate standing before they had the right to intervene. She contends that the express terms of the plan would be violated if this court were to find that, despite those express terms, the plan created freestanding visitation rights for the Finns. With regard to the Finns' statutory argument, she points out that the Finns did not allege, let alone prove, that "there has been an unreasonable denial of visitation by a parent and the denial has caused the child undue mental, physical, or emotional harm," as required by the statute. She also contends that, with regard to the statute governing intervention as a matter of right in Illinois, even if the Finns "have an interest which should be protected, [they] have failed to prove their interests do not coincide with Amanda's interests and therefore this [c]ourt has no reason to find that Amanda would be unable to sufficiently protect their interests." She further contends that the purpose of the statute in question "is to prevent relitigation of the same issues in a second suit," but that "in this case, a second suit would not be possible given the current facts of this case," because "any orders of visitation would only be filed in this case." Angelica therefore asks this court to affirm the trial judge's orders in all respects.

¶ 29    In reply to Angelica's arguments, Amanda contends that the cases she cited in her opening brief do, for the most part, involve joint decision-making, and therefore are relevant to this case. She also attempts to distinguish the cases cited by Angelica for the proposition that Amanda has not shown that the trial judge's order in this case was against the manifest weight of the evidence. She argues that joint decision-making is not permissible "where the parties cannot work together." Amanda further argues that she was not required to file a motion to reconsider prior to raising her "reallocation hearing" argument on appeal.

14

¶ 30   In reply to Angelica's arguments, the Finns contend, *inter alia*, that "section 602.9(d) merely lays out the criteria for modification of grandparents time" and "is silent on any specific party designation." They thereafter concede that, in this case, the Finns' parenting time was "established by agreement." They argue that although it "appears" to them that Angelica's position is "that the contract prohibits intervention," their position is that "section 801 of the [Act] mandates application of 750 ILCS 5/602.9, and except in enumerated circumstances, cannot be contravened by court order." The Finns thereafter reiterate that "[t]hey are challenging the order denying intervention on the grounds that section 602.9 of [the Act] supersedes" the terms of the plan.

¶ 31   We begin by addressing Amanda's arguments on appeal, starting with her argument that the trial judge erred when she modified medical decision-making responsibilities from being solely Amanda's responsibility, to being the joint responsibility of Amanda and Angelica. As noted above, Amanda does not challenge any other modifications made by the trial judge. When a party challenges a trial judge's ruling on the allocation of decision-making responsibilities, this court will not disturb that ruling unless the ruling is against the manifest weight of the evidence. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 47. We have long held that a ruling is against the manifest weight of the evidence only if the opposite conclusion to that reached by the trial judge is apparent, or if the trial judge's findings appear to be unreasonable, arbitrary, or not based upon the evidence that was presented to the trial judge. *Id*. "It is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Id*. ¶ 50. One reason for that is that "[i]t is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence." *Id*. ¶ 51. When a party's arguments on appeal are "in the nature of an attempt to force this court to reweigh the evidence and reassess witness credibility," we will find the arguments to be without merit. *Id*.

15

¶ 32    In this case, there was ample evidence to support the trial judge's decision. With regard to Amanda's argument on appeal that joint decision-making is not permissible "where the parties cannot work together," and that "[t]he record is replete with examples of the parties' total failure to work together," we note that only Amanda testified that the parties cannot work together, and, as explained below, even she equivocated about that point during her testimony. All of the other witnesses testified only that Amanda and Angelica *struggle* to work together and at times have high levels of conflict, not that they *cannot* work together.

¶ 33    Specifically, Dr. Clipper testified that he believed his recommendation that medical decision-making responsibility should be changed from Amanda's sole responsibility to a joint responsibility of Amanda and Angelica was justified because he believed it was in the children's best interest for Amanda and Angelica to work together to make medical decisions, rather than having only one parent make the decisions. He testified that if Amanda and Angelica could "adequately thoughtfully attend the children's medical needs," that would be in the best interest of the children. He testified that he believed Amanda's position amounted to a desire to keep Angelica "out of the lives of the children," which was a position for which he found no support. He testified that therefore he believed Angelica's position, which was that they should share decision-making, was more reasonable. He agreed that in his report, he found both Amanda and Angelica to be fit parents, although he believed they "struggled" with coparenting. He acknowledged that his report was prepared approximately one year prior to the trial, and that circumstances could have changed since then.

¶ 34    On cross-examination, Dr. Clipper testified that given the difficulty they had getting along with each other, he believed that it was in the children's best interest to "balance the playing field" so that Amanda and Angelica had to work together, rather than allowing one of them to have sole decision-making power, which he believed would be used to "manipulate" the other party. He

16

testified that he believed that when Amanda had sole medical decision-making power, she "utilized" that power in a way that created conflicts with Angelica. He testified that with regard to medical decision-making, he believed each parent should be able to make her own decision on minor or "routine care" matters when that parent had the children, as long as she kept the other parent informed, but that on "larger, more extreme, kind of, care kind of things *** they should be involved jointly in making that decision."

¶ 35 Angelica and Amanda also testified, with each describing their interactions—including conflicts—with each other, as well as interactions with the children. With regard to coparenting, Angelica testified that she believed her coparenting with Amanda had improved since they began to have less face-to-face contact. She did not testify that they could not coparent together. She testified as to times when she felt her power to help the children with medical issues was limited by the fact that Amanda had sole medical decision-making responsibility. She testified that although she and Amanda usually agreed on a course of medical treatment once it was recommended by a physician, they often disagreed on the threshold question of whether medical care was warranted in a given situation. She testified that she wanted medical decision-making responsibility to be joint because as things currently stood, Amanda had indicated that she was not comfortable with Angelica making appointments for "even routine care" and had, in essence, completely shut Angelica out of medical decisions, including by attempting to limit her access to the children's medical records.

¶ 36 Amanda testified that although she did exercise her sole medical decision-making power "when necessary," she nevertheless did "try to consider [Angelica's] thoughts and opinions." She acknowledged a great deal of conflict with Angelica in 2019, but testified that "I feel like as bad as things were in 2019, I have tried hard to change the way that I feel about the situation and try and just move forward for the boys. I know that the boys' needs require us to work together." She

17

testified that she knew Angelica loved the children, but believed that Angelica was "so spiteful and angry with [Amanda] about everything" that the two of them could not "co-parent effectively." Despite this assertion, she added that she believed it was "important to be able to move past those disagreements, though, so that we can get back to working together for the boys." She testified that she believed she and Angelica had "a duty to one another and to the boys to work together," and added that she "would love nothing more than for us to co-parent like parents" she observed. She testified, however, that she worried that their communication problems would prevent that. She thereafter testified that she had been attending counseling, found it helpful for dealing with her issues with Angelica, and did not "want to parent alone." She added, "I don't think that that's great for kids anyway. I think that if kids can have two good parents in their life, they should." Thus, even Amanda allowed for the possibility of working with Angelica in the best interest of the minor children, a fact that undermines her allegation on appeal that "[t]he record is replete with examples of the parties' total failure to work together," and that they cannot work together.

¶ 37   Moreover, the GAL testified that she had reviewed Dr. Clipper's reports, and was present for his testimony at trial. She testified that she agreed with his recommendations on decision-making. She explained that she believed there was "a power struggle between Amanda and Angelica that" she believed was "primarily coming from Amanda." She testified that she believed that "if there's any power that one party has over the other, it negatively impacts their ability to co-parent. And so if they have equal power, hopefully that will at least take down some of the problems that are created by that power imbalance." She testified that although she was "concerned they're going to continue with the high level of conflict," she believed "that ultimately they both have the same desire to have healthcare for their children and to have healthy children," which led her to believe "that if they both have the same responsibility—the same amount of responsibility for decision-making that they will ultimately make good decisions for their children." For that

18

reason, she too recommended joint medical decision-making responsibility. On cross-examination, the GAL testified that she did not believe that under joint medical decision-making, there would be delays to either emergency or routine care for the children.

¶ 38   In her order, the trial judge ruled, with regard to joint medical decision-making responsibility, that in light of the foregoing testimony and other evidence of record, and in light of the relevant statutory best-interest factors, which she discussed in detail, she agreed with Angelica. She noted that she found both Amanda's and Angelica's testimony about some of the conflicts between them to be "somewhat hazy," but also noted the positive testimony that each gave about the other, in particular that each believed the other was a good parent who loved the minor children and was doing her best for them. The trial judge pointed out that evidence of conflict between Amanda and Angelica certainly existed, and gave several examples of it, but noted that Dr. Dyer had testified that there was no reason Amanda and Angelica could not share joint parenting, and that Dr. Clipper and the GAL both agreed with that assessment. Thus, as Angelica points out on appeal, the trial judge in this case specifically considered the parties' past history of conflict, and there is no merit to any argument that she failed to adequately address that as a factor in reaching her decision.

¶ 39   Moreover, we do not believe that any of the cases cited by Amanda compel a different result. For example, in *In re Marriage of Virgin*, 2021 IL App (3d) 190650, ¶ 49, the reviewing court based its decision in part on the fact that the record before it was "replete with evidence that the parties ha[d] too much animosity to sufficiently cooperate," including testimony "that there had been around six orders of protection, multiple DCFS investigations, criminal proceedings, and mutual restraining orders." Thus, the facts in *Virgin* are far different from the facts in this case, and, as explained above, Amanda is simply incorrect in her assertion on appeal that the record in this case shows that she and Angelica cannot work together in the best interest of the children. We

19

likewise reject Amanda's contention that "[i]t could be inferred that this modification was experimental," to see if the parties could work together better if required to make decisions jointly, and that courts typically frown upon experimental modifications. The sole case cited by Amanda in support of this purported inference is *In re Marriage of Valliere*, 275 Ill. App. 3d 1095, 1099-1104 (1995), in which the reviewing court rejected the trial court's order because it found that the order was an interim, temporary, and experimental order. By contrast, the order in this case was not interim or otherwise temporary, and because the order was based on the evidence before the trial judge—including the testimony of multiple witnesses—we do not agree that there exists a reasonable basis from which one could "infer" that the order was experimental.

¶ 40    In light of the foregoing, we find that Amanda's argument on appeal is nothing more than "an attempt to force this court to reweigh the evidence and reassess witness credibility," which we will not do. See *Jameson*, 2020 IL App (3d) 200048, ¶ 51. Our thorough review of the evidence adduced at trial, and the trial judge's order, leaves us with the firm conviction that the trial judge's ruling is not against the manifest weight of the evidence, because the opposite conclusion to that reached by the trial judge is not apparent, and the trial judge's findings are not unreasonable, arbitrary, or not based upon the evidence that was presented to the trial judge. *Id*. ¶ 47. As explained above, "[i]t is no small burden to show that a circuit court's ruling on decision-making responsibilities is against the manifest weight of the evidence." *Id*. ¶ 50. In this case, Amanda has not met that burden on appeal. Accordingly, we decline to disturb the trial judge's ruling.

¶ 41    With regard to Amanda's "reallocation hearing" argument, we note that the only motion for costs and fees referenced in Amanda's opening brief on appeal is her April 23, 2021, motion. Accordingly, she has forfeited consideration of any arguments related to any prior allocation of costs and fees found in earlier orders of the trial judge. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the

20

citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing). With regard to her April 23, 2021, motion, in support of her argument that the trial judge erred when she did not hold a reallocation hearing, Amanda argues that existing case law required the judge to hold a hearing upon the motion, and that the trial judge did not have discretion to fail to do so. The sole case Amanda cites in support of that proposition is *In re Marriage of Selinger*, 351 Ill. App. 3d 611 (2004). Therein, as Amanda notes, this court held that there exists "an affirmative duty on the trial court to hear and decide fee-contribution petitions," and that although this does not mean there must be a separate hearing, it does mean that "additional proofs, through testimony or otherwise, must be heard." *Id*. at 622-23. However, Amanda neglects to cite, analyze, or attempt to distinguish what we actually held thereafter in *Selinger*, which was that "[t]he lack of a hearing *** is not dispositive" where (1) the assets and liabilities of the parties, as well as the amount of fees requested, were already before the court, and no argument was presented as to "what other evidence had to be presented for the court to rule on [the motion]"; (2) the movant failed "to call it to the court's attention [that] she believed an additional hearing was necessary prior to issuance of the court's order"; and (3) the movant failed, prior to filing her appeal, to alert the trial judge to the lack of a hearing, which was important because "[t]he failure to hold a hearing would have been easily correctable in the trial court." *Id.* at 623. We held that the movant's "failure to take these steps" was a bar to her attempt on appeal to "challenge the trial court's alleged failure to hold a hearing on her motion for contribution to attorney fees." *Id.*

¶ 42    In this case, too, we find that the lack of a separate hearing is not dispositive. Amanda has made no argument as to whether the assets and liabilities of the parties were already before the court, and no argument as to what other evidence had to be presented for the trial judge to rule on her motion. Moreover, she never requested, at the trial-court level, a hearing, never asserted to the

trial judge that such a hearing was necessary, and never alerted the trial judge to the lack of a hearing. Had she done any of these things, the trial judge could have easily corrected any alleged errors. We find, as did the *Selinger* court, that Amanda's failures prevent her from contesting on appeal the lack of a hearing on her motion. Put simply, the authority presented by Amanda on appeal does not support her argument that the trial judge erred in this case, and in fact supports the opposite argument.

¶ 43    In addition, as explained above, although the trial judge's order listed, in a separate section, "pleadings" that were "[p]ending before the [c]ourt," it did not specifically list, in that section, Amanda's April 23, 2021, motion for costs and fees. However, elsewhere in the order, in a section of the order entitled "[a]ttorney fees," the trial judge ruled, "Each party is ordered to pay their own attorney fees *and costs*." (Emphasis added.) In a section of the order entitled "GAL fees," the trial judge ruled that Angelica was required "to pay the remainder of the GAL Fees still due and owing." The trial judge did not otherwise order either party to pay the other for any costs or fees. To the extent that Amanda did not understand the interplay between these rulings and her request for reallocation or reimbursement for mediation fees, GAL fees, custody evaluation fees, and drug testing fees, or to the extent that she believed the trial judge's order did not adequately rule on her requests, she should have filed, in the trial court, a motion to clarify the trial judge's ruling, or a motion to reconsider it. She did not, and therefore there exists no basis for this court to conclude that the trial judge failed to consider and rule upon Amanda's motion, especially in light of the fact that the trial judge's order specifically addressed GAL fees (and ruled in Amanda's favor on that point, as requested in Amanda's motion), and, as explained above, specifically ordered each of the parties to pay her own costs. Moreover, Amanda makes no argument on appeal with regard to how the trial judge might have erred in her ruling, or why Amanda should have prevailed on her motion with regard to each of those fees. Accordingly, she has forfeited consideration of any arguments

22

related to the propriety of the trial judge's rulings on these points. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument must contain the contentions of the appellant, the reasons therefor, and the citation of authorities; points not argued in an opening brief are forfeited and shall not be raised in the reply brief, in oral argument, or in a petition for a rehearing).

¶ 44    We turn now to the argument raised by the Finns. As explained above, on appeal the Finns posit that because they were not signatories to the plan, their right to grandparent visitation is statutory in nature, deriving from the Act, and that therefore the provisions of the Act that deal with modification of grandparent visitation must prevail in this case, notwithstanding the terms of an agreement—the plan—to which they are not parties. As noted above, in their reply brief, they assert that "[t]hey are challenging the order denying intervention on the grounds that section 602.9 of [the Act] supersedes" the terms of the plan.

¶ 45    A grandparent or other "appropriate person" under the terms of the Act who wishes to invoke the protections of the Act may file a petition for visitation under the Act "only if there has been an unreasonable denial of visitation by a parent and the denial has caused the child undue mental, physical, or emotional harm." 750 ILCS 5/602.9(b)(1), (b)(3) (West 2020); 750 ILCS 5/602.9(c)(1)(D) (West 2020). The Act specifies that "[t]here is a rebuttable presumption that a fit parent's actions and decisions regarding grandparent *** visitation are not harmful to the child's mental, physical, or emotional health," and that the petitioning individual bears the burden "to prove that the parent's actions and decisions regarding visitation will cause undue harm to the child's mental, physical, or emotional health." 750 ILCS 5/602.9(b)(4) (West 2020). The Finns point out that section 602.9(d) of the Act is entitled "[m]odification of visitation orders," and posit that the trial judge should have been required to follow its requirements, which the Finns insinuate (without directly arguing) must apply to the modification of *any* agreement involving grandparent

visitation, regardless of whether the agreement was a visitation order entered pursuant to a petition filed under the Act or was an agreed order such as the plan.

¶ 46    In this case, the Finns did not, in the trial court, file a petition in which they asserted the right to grandparent visitation under the Act, and did not allege that there existed an unreasonable denial of visitation by a parent that had caused the children in this case undue mental, physical, or emotional harm. Accordingly, as they concede, they were not granted visitation rights pursuant to the Act. As a result, we do not believe they are entitled to invoke the modification protections, found in section 602.9(d), afforded to those who have been granted visitation rights pursuant to the Act. They have provided no legal authority that supports their position that the modification protections of section 602.9(d) of the Act should be extended to visitation interests that were not afforded pursuant to the Act, and we are aware of none. They also have provided no compelling legal, or public policy, arguments in support of their position, and again we are aware of none. Indeed, to allow grandparents to invoke the modification protections of the Act without first proving an entitlement to visitation pursuant to the Act would be very bad public policy, as it would eviscerate the protections that the Act provides to *parents*, the foremost of which is that a petition may succeed under the Act only if the petitioner proves that there has been an unreasonable denial of visitation by a parent that has caused the child undue mental, physical, or emotional harm. It would also be very bad public policy for grandparents in general, as it would have a chilling effect on agreements, such as the plan in this case, because fewer parents would be willing to include grandparent visitation in such agreements if doing so would invalidate any modification provisions they also included in the agreement and would instead provide grandparents with the modification protections found in a piece of legislation—section 602.9(d) of the Act—that is otherwise unrelated to their agreement. As Angelica points out on appeal, the express terms of the plan would be violated if this court were to find that, despite those express terms, the plan created

24

freestanding visitation rights for the Finns that they could then attempt to "defend" by invoking the modification provisions of the Act in an attempt to overrule the express language of the plan. For the foregoing reasons, we see no legitimate reason the Finns should be allowed to invoke the modification protections of section 602.9(d) under the circumstances of this case.

¶ 47    To date, the only visitation rights afforded to the Finns are those that were found in the plan, and as the trial judge correctly noted, the plan expressly stated the conditions under which those rights would terminate. The trial judge did not err in following the dictates of the plan and terminating the Finns' visitation after she found that Amanda and Angelica "clearly" could not agree on the continuation of the Finns' time, and after multiple witnesses testified that the issue led to increased conflict between Amanda and Angelica and that the Finns would have ample access to the children during Amanda's parenting time. The trial judge also did not err when she denied the Finns' petition for leave to intervene in this action, because the Finns, as described above, did not properly invoke the Act by filing an appropriate petition thereunder, and thus could not seek protection under the modification provisions of the Act. Thus, their contention "that section 602.9 of [the Act] supersedes" the terms of the plan is without merit, and the remainder of their argument related to their desire to intervene necessarily fails.

¶ 48                                    III. CONCLUSION

¶ 49    For the foregoing reasons, we affirm the order of the circuit court of Madison County that modified the plan, and we affirm the order that denied the Finns' petition for leave to intervene.


¶ 50    Affirmed.

25